### AFFIDAVIT OF SPECIAL AGENT WILBERT C. MOY
### IN SUPPORT OF A CRIMINAL COMPLAINT

I, WILBERT C. MOY, being duly sworn, depose and state:

1. I am a Special Agent of the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), currently assigned to the Office of the Special Agent in Charge in Boston, Massachusetts, and have been employed in that capacity since 2001. I have been assigned to the Airport/Seaport Group since 2014, and am responsible for investigating any importation into the United States contrary to law. Prior to my current position, I was assigned to the Document and Benefit Fraud Task Force from 2007 to 2014. From 2001 to 2007, I was assigned to the Cybercrimes Group and investigated child pornography and child exploitation crimes.

2. This affidavit is based upon information supplied to me by other law enforcement officers, my personal involvement in this investigation, and my training and experience. In submitting this affidavit, I have not included each and every fact known to me about the investigation, but instead have included only those facts that I believe are sufficient to establish the requisite probable cause.

3. On July 31, 2015, MELISSA GUERRERO PENA ("PENA"), DOB xx/xx/1995, arrived at Logan International Airport in Boston,

MA, on JetBlue flight #830 from Santo Domingo, Dominican Republic. PENA, a citizen of the United States, presented herself to the primary Customs and Border Protection Officer ("CBPO") for inspection.

4. The CBPO asked PENA for her passport, and noticed that her hand was visibly shaking. The CBPO noted that her passport was issued on July 24, 2015, and that she had traveled to the Dominican Republic on July 26, 2015. Based on PENA's demeanor, her recent procurement of a passport, and the relatively short length of her stay in the Dominican Republic, the CBPO referred PENA for secondary inspection.

5. PENA was escorted to the Customs and Border Protection ("CBP") secondary baggage inspection area and was selected for examination by CBPO Michael Carbone. CBPO Carbone emptied her luggage, and noticed that the empty suitcase was heavier than he expected. PENA's suitcase was x-rayed, and an anomaly was observed in one of the exterior panels of the luggage.

6. CBPOs probed the portion of the luggage where the anomaly was observed, and a white powdery substance was retrieved. The substance was field tested, and tested positive for cocaine. The luggage panel was disassembled, revealing one brick that appeared to contain a white powdery substance, wrapped in plastic, and then wrapped in a substance that appeared to be Kevlar tape and sewed into the interior of the

luggage. The brick was removed from the luggage and placed on a scale. The total gross weight of the brick was determined to be 2,555 grams (2.555 kilograms).

7. At approximately 10:50 a.m. I encountered PENA and asked her if she spoke English. She replied that English was her first language, and that she also speaks Spanish. I then provided PENA with her Miranda warnings in English. PENA stated that she understood the warnings, signed a waiver of her rights, and agreed to speak with me without counsel present.

8. PENA stated that she has a family friend who asked her to travel to the Dominican Republic and return with something in her luggage. PENA said that her friend said that it would be easy, and that she would do it first to show PENA that nothing would happen to her. PENA stated that she agreed to travel to the Dominican Republic after her friend returned without incident.

9. PENA stated that her friend told her that she would be bringing something back that was not drugs, but that it was something that went into drugs. She further mentioned that she did not know if it would be money, or if it was something else. PENA stated that her friend told her that what she would be bringing into the United States would not be illegal, but that nonetheless the airport would have a hard time with it.

3

10. PENA stated that her friend arranged for her to obtain a renewal passport on July 24, 2015, and paid the passport renewal fees. PENA went with her friend to purchase a plane ticket to the Dominican Republic, and her friend paid for the ticket in cash.

11. PENA said that she traveled to the Dominican Republic on July 26, 2015. Upon arrival, PENA was picked up by an individual whom she did not previously know, and was driven to her grandmother's house. On July 31, 2015, she was picked up by the same individual. She stated that on the way to the airport, they stopped, and the luggage was emptied of its contents and the contents were placed into another bag. A taxi was then called for her, and drove her to the airport with the new bag.

12. PENA stated that she was instructed to meet someone at Logan Airport upon arrival in Boston, who would take her to her friend's home in Dorchester, where she would leave the bag.

13. Based upon the information set forth above, I submit there is probable cause to conclude that on July 31, 2015, PENA knowingly imported merchandise, to wit, cocaine, contrary to law, in violation of Title 18, United States Code, Section 545.

Sworn to under the pains and penalties of perjury,



_____
WILBERT MOY
Special Agent
U.S. Department of Homeland Security
Homeland Security Investigations

Sworn and subscribed before me this 31st day of July 2015.

_____
DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE